UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DANIELLE CAMPO,

                     Plaintiff,

        -against-

CITY OF NEW YORK, JOHN RINGEL, JANICE
HOLMES, BRIAN FOLEY, PAUL MARECKI, and
JON MERCADO,

                  Defendants.

**MEMORANDUM & ORDER**
**19-CV-04364 (NGG) (SJB)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Danielle Campo brings this employment discrimination action against Defendants City of New York and police officers John Ringel, Janice Holmes, Brian Foley, Paul Marecki, and Jon Mercado, alleging sexual harassment and unlawful retaliation. Before the court are motions (1) by Defendants John Ringel, Janice Holmes, Brian Foley, Jon Mercado, and the City (together, the "City Defendants") for partial summary judgment; and (2) by Defendant Paul Marecki for summary judgment dismissing Plaintiff's claims against him. For the following reasons, the court DENIES Defendant Marecki's motion for summary judgment and GRANTS in part and DENIES in part the City Defendants' motion for partial summary judgment.

**I.   BACKGROUND**

    **A.   Facts**

The court constructs the following statement of facts from the parties' Local Rule 56.1 statements and the admissible evidence submitted. (*See* City Defendants' Rule 56.1 Statement ("City 56.1") (Dkt. 45); Marecki Rule 56.1 Statement ("Marecki 56.1") (Dkt. 40); Campo Counterstatement to City 56.1 (Dkt. 52-30);

1

Campo Counterstatement to Marecki 56.1 (Dkt. 51-30).) All evidence is construed in the light most favorable to the non-moving party, in this case the Plaintiff, on each motion, with "all reasonable inferences" drawn in her favor. *ING Bank N.V. v. M/V Temara, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018).[1] The following facts are uncontested unless otherwise noted.

      1.      Alleged Sexual Harassment by Marecki

NYPD Officers Danielle Campo and Paul Marecki first met when they became colleagues at the 100th Precinct in early 2012. (Campo Counterstatement to City 56.1 ¶¶ 1-2, 4; Campo Counterstatement to Marecki 56.1 ¶¶ 1-4, 11.) They became friends and socialized together outside of work once every couple of months together with a small group of mutual friends. (Campo Counterstatement to City 56.1 ¶ 5; Campo Counterstatement to Marecki 56.1 ¶¶ 5-10.) The two also frequently communicated via text message, discussing, among other things, work, stress, social plans and events, and family health issues. (Campo Counterstatement to Marecki 56.1 ¶¶ 21-27.) Sometimes, they made profane jokes and engaged in crude banter. (*Id.* ¶¶ 35-45.)

Though the majority of their conversations were friendly, Marecki on occasion sent Campo sexually charged text messages. (*Id.* ¶¶ 22, 26; *see generally* LaBarbera Decl. Ex. C ("Text Messages") (Dkt. 41-3).) The first of these messages (in the record) were sent on September 20, 2014. (Campo Counterstatement to Marecki 56.1 ¶¶ 47-50; Text Messages at 288-95.) Marecki – after saying that he had been "up for about 30 hours" due to work and was "punchy" from a "[s]econd cocktail" – asked, "would it be wrong to say I want you in my mouth? To make you cum?" and then, "I would date you. . . . I really think we could have a great cuddle." (Campo Counterstatement to Marecki 56.1 ¶¶ 47-

---

[1] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted and all alterations are adopted.

50; Text Messages at 292, 294.) Campo replied, "You know I love you and think you are one of the greatest guys I am lucky to call my friend… I just can't date someone I am friends with like we are . . . ." (Campo Counterstatement to Marecki 56.1 ¶ 49; Text Messages at 294.) Several months later, on May 4, 2015, Marecki, urging Campo to come to a social event, wrote, "Don't be a vagina hole. Wait….thats not a bad thing. Well you know….." and later asked, "You expecting a rim job tonight?" (Campo Counterstatement to Marecki 56.1 ¶¶ 57-63; Text Messages at 314.) Campo responded by expressing laughter and changing the topic. (Campo Counterstatement to Marecki 56.1 ¶ 64.)

Despite these and other sexually charged messages, Officers Campo and Marecki continued to socialize outside of work and exchange other, friendlier text messages as well. (*See* Text Messages at 315; Campo Counterstatement to Marecki 56.1 ¶¶ 64, 70-71.) On January 21, 2016, Marecki sent Campo a message reading: "You know I would lick." (Campo Counterstatement to Marecki 56.1 ¶¶ 80-81.) Campo responded in shock, and the following day, she told Marecki:

> I don't know what your deal is with me lately but you have really pushed the boundaries of this friendship Paul. For the 100th time I will not be spoken to or treated that way from someone who I call a friend. You have been throwing digs and making inappropriate comments to me when you drink. I'm done with being nice about it. You are being a shitty person to me.

(*Id.* ¶¶ 82-83.) She blocked his number immediately thereafter. (*See* Campo Counterstatement to Marecki 56.1 ¶¶ 20, 83.)

Eleven months later, on December 19, 2016, she unblocked him, initiated a casual conversation, and, later, in reference to his prior "drunk texts," told him: "[don't] worry about it. You finally apologized and for me it's 100% over. That's all it took lol". (Campo

Counterstatement to Marecki 56.1 ¶¶ 22, 83-84, 107.) But what-
ever reconciliation may have occurred, it was short-lived. In
January, Campo and some of Marecki's friends held a meeting
with him to communicate their concerns about his alcohol use,
and in response, he sent Campo an aggressive Facebook mes-
sage. (*Id.* ¶¶ 119-20.) On January 27 and February 6, he sent her
more sexual messages, and on the latter date she blocked him
once more – this time permanently. (*Id.* ¶¶ 114, 116-18, 123.)

The immediate consequence of this blocking was that Marecki
sent Campo a rude Facebook message accusing her of sexual im-
propriety. (*Id.* ¶ 121.) The long-term consequence, allegedly, was
that Marecki's harassing conduct escalated severely. Campo tes-
tified that, from then on, any time she saw Marecki at work he
would call her demeaning and sexually charged names like
"whore," "homewrecker," "cunt," "thundercunt," and "shit bag."
(*Id.* ¶ 123; Campo Dep. (Dkt. 52-1) at 27:22-28:3.) According to
Campo, Marecki also slandered her behind her back, and another
officer in the precinct corroborated this allegation. (Campo Aff.
(Dkt 52) ¶ 96; Campo Ex. 19 (Dkt. 52-26).) Marecki's slurs and
slander allegedly persisted until 2019, when Marecki was trans-
ferred out of the 100th Precinct. (Campo Counter to City 56.1 ¶¶
38-39.)

> 2. Alleged Informal Complaints to Sergeants Foley
> and Ringel

Campo testified that, around 2013 or 2014, she first complained
to Defendant Brian Foley, then a sergeant at the 100th Precinct,
and to other supervisors that Marecki "would be getting drunk
and text [her] all sort of crazy things in the middle of the night."
(Campo Counterstatement to City 56.1 ¶ 7; Campo Dep. at 54:5-
11.) She further testified that Foley disregarded her complaints.
(Campo Counterstatement to City 56.1 ¶ 7.) Campo later submit-
ted an affidavit stating that she complained to Foley
"often . . . through 2018" and that she "was explicit with Foley

[that] the texts were sexual in nature." (Campo Aff. ¶ 7.) Foley testified that he could not recall Campo ever mentioning or showing him any sexually explicit text messages from Marecki. (Foley Dep. (Dkt. 52-4) at 16.17-17.10.)

Campo also allegedly complained about Marecki on numerous occasions between 2016 and 2018 to Defendant John Ringel, a sergeant at the 100th Precinct and a supervisor of them both. (Campo Counterstatement to City 56.1 ¶ 20.) Ringel allegedly responded with jokes, likening Marecki's conduct to the horror movie *Silence of the Lambs* and joking about Marecki hiding in Campo's backyard in the trees. (*Id.* ¶¶ 20-22.) Ringel also allegedly mocked Campo's situation in front of other officers. (*Id.* ¶ 22; Campo Aff. ¶ 18.)

### 3.    Reassignments and Alleged Sexual Assault and Harassment by Mercado

Prior to June 2017, Campo mainly worked the 4:00 P.M. to midnight tour as a Patrol Officer. (Campo Counterstatement to City ¶ 3.) In June 2017, Campo was assigned to be a Neighborhood Coordination Officer ("NCO"). (Campo Counterstatement to City ¶ 24.) Campo describes NCO as a "prestigious and highly sought after" position that offered her a "significant improvement in working conditions." (*Id.*) Specifically, she says NCOs that "make their own hours, choose their days off, wear plain clothes" and that the position is "conducive to career advancement." (*Id.*) Campo was assigned Officer Jonathan Mercado, who was also an NCO, as her partner. (*Id.*) She and Mercado became friends and socialized outside of work. (*Id.* ¶ 26.) Campo testified that she was reassigned from NCO back to patrol in early January 2018, because the administrative lieutenant believed she was absent without leave, although in fact she was on a pre-approved vacation. (*Id.* ¶ 28.)

Later that month, Campo and Mercado attended a precinct holiday party at a restaurant, and then, together with three other

officers, they continued the evening at a bar in Long Beach, Nassau County. (*Id.* ¶ 29.) Campo testified that she offered Mercado a ride home and that thereafter, in her car, he demanded she perform oral sex on him; pulled her head towards his penis; grabbed her breasts; and pulled her hair. (*Id.*) She further testified that, after she fought back, he exited the car and she drove away. (*Id.*)

Campo testified that, in March 2018, she was reinstated as an NCO, after Inspector Janice Holmes, the commanding officer of the 100th Precinct, told her that her prior transfer out of NCO had not been approved by administrators. (*Id.* ¶ 30.) Campo alleges that she was not happy about going back to NCO, but that Holmes insisted on it, telling her she was "already on thin ice." (*Id.*) Campo alleges that, after she returned, Mercado greeted her by saying, "I can't believe you have the balls to come back." (*Id.*) Mercado allegedly mistreated her, repeatedly left for tours without Campo, and abandoned her on the street during tours. (*Id.*) Campo described her experience upon returning to NCO as the "most uncomfortable situation of [my] life." (Campo Aff. ¶ 40.)

Campo's reinstatement was short-lived. Mercado testified that in April 2018 he reported to supervisors that community members had complained that Campo was not returning their phone calls. (Mercado Dep. (Dkt. 52-6) at 10-12, 16, 18.) Soon thereafter, ostensibly as a result of this report, Inspector Holmes removed Campo from her NCO position and reassigned her to patrol. (Campo Counterstatement to City 56.1 ¶¶ 32-33.) Campo alleges that, after being removed, she was put in a materially worse position than before she was assigned to NCO. (*Id.*) Specifically, she alleges that she was a "floater," *i.e.*, she could no longer make her own shift and was not given a steady partner; she was not in a steady sector assignment after her removal; and she was tasked with unfavorable assignments such as guarding prisoners in the hospital and performing security at One Police Plaza. (*Id.* ¶¶ 32,

49.) Campo also alleges that, upon returning to patrol, Mercado called her derogatory names like "dirty whore," "fucking bitch," and "thundercunt," under his breath while walking past her at the precinct. (*Id.* ¶ 33.)

### 4.    Campo's Internal Complaint

Campo allegedly made an anonymous report to the NYPD's Internal Affairs Bureau on April 1, 2018. (*Id.* ¶ 34.) At the end of that month, about two weeks after being reassigned to patrol, Campo sent an email to Inspector Holmes reporting a "very hostile work environment" and "some sort of retaliation," describing Marecki's inappropriate texts and in-person hostility and slurs, Mercado's sexual assault and in-person hostility, and what she felt was a wrongful and retaliatory removal from NCO. (*Id.*; Campo Ex. 8 (Dkt. 52-15).) Holmes then contacted the NYPD's Internal Affairs Bureau ("IAB") and Equal Employment Opportunity Division ("EEO"). (Campo Counterstatement to City 56.1 ¶ 35.) IAB records submitted into evidence indicate that, at the time, Holmes expressed disbelief regarding the allegations and suggested Campo needed psychological help. (Campo Ex. 22 (Dkt. 52-29).) Holmes allegedly did not notify Campo that she had referred the complaint to the EEO and IAB, leading Campo to reach out to those agencies directly. (Campo Counterstatement to City ¶¶ 35-36.) The IAB then initiated an investigation. (*See generally* Campo Ex. 22.)

On July 30, Campo filed a police report against Mercado with the Long Beach Police Department, which declined to pursue the case. (Campo Counterstatement to City 56.1 ¶ 44.) On that date, Campo also filed a criminal complaint in Nassau County against Marecki, which was investigated and closed. (*Id.* ¶ 46.)

Campo was offered a transfer out of the precinct, which she declined. (*Id.* ¶ 37.) Campo alleges that this did not occur until nearly four months after her email to Holmes. (*Id.*) Campo declined the offer on the basis that it "felt unfair that I would be the

one to be transferred." (Campo Aff. ¶ 79.) After her complaint to Holmes, Campo alleges that the in-person harassment from Marecki and Mercado intensified, to the point that they directed sexual slurs at her "at least twice a week, likely much more." (*Id.* ¶ 76.) Campo also alleges that Inspector Holmes, with whom she had previously been friendly, became cold and ceased conversing with her. (Campo Aff. ¶ 50.) Campo alleges that she made ongoing complaints about her deteriorating workplace environment to the IAB during the pendency of the investigation. (*See generally* Campo Aff. ¶¶ 61-77.) She testified that on May 3, 2018, her memo book went missing from her locker, which had been "tampered with." (Campo Counterstatement to City ¶ 47.) She alleges that the event is suggestive of retaliation, a suspicion that deepened when her application for a temporary detail to the 2019 summer Harbor Unit was denied. (*Id.* ¶¶ 47-54.)

Campo alleges that the IAB investigation took about a year and a half. (*Id.* ¶ 38.) The City asserts that, in the course of its investigation, the IAB interviewed twenty-three members of the department; Campo insists that the IAB's interviews totaled only five and a half hours in aggregate, and that the IAB delayed for over a year before interviewing Marecki and Mercado. (*Id.*) The IAB did, however, review Campo and Marecki's phone records. (*Id.*) Ultimately, Marecki was subject to a Command Discipline, penalized five vacation days, and transferred to another precinct, although Campo claims this penalty was not directly in response to her complaint. (*Id.* ¶ 39.) The investigation ultimately found to be unsubstantiated Campo's complaints about other officers – including her complaints about Mercado and about Ringel and Foley's failure to report Marecki's harassment. (*Id.* ¶ 40.)

Inspector Holmes was replaced by Inspector Hall in December 2019. (*Id.* ¶ 55.) Campo alleges that she promptly asked Hall for an assignment away from Mercado, and he agreed and assigned her to the roll call desk, allowing her to avoid the shift Mercado

worked. (*Id.*) Since February 2020, Campo has been on medical leave; she attributes this to the psychological effects of the harassment and retaliation she suffered at work. (*Id.* ¶ 56.) In the meantime, her salary, rank, and benefits have remained unchanged. (*Id.* ¶ 57.)

### B. Procedural History

Plaintiff filed this action on July 30, 2019, naming the City of New York, Brian Foley, Janice Holmes, Paul Marecki, Jon Mercado, and John Ringel as defendants. (Compl. (Dkt. 1).) The complaint alleged (1) hostile work environment and sexual harassment claims against Marecki and Mercado, in violation of 42 U.S.C. § 1983; (2) supervisory liability and retaliation claims against Ringel, Holmes, and Foley, also in violation of § 1983; (3) a *Monell* claim against the City under § 1983; (4) hostile work environment and retaliation claims under Title VII, the NYSHRL, and the NYCHRL against the City; and (5) aiding and abetting claims under the NYSHRL and the NYCHRL against the individual defendants. (*Id.* ¶¶ 60-66.) Foley, Holmes, Mercado, Ringel, and the City (the "City Defendants") jointly answered on November 11, 2019. (City Defs. Answer (Dkt. 12).) Marecki separately answered on December 9, 2019, and filed a crossclaim for indemnification against the City. (Marecki Answer (Dkt. 20).) On November 4, 2020, the parties stipulated to dismissal of Plaintiff's § 1983 claims against Mercado and Marecki.

On April 9, 2021, the City Defendants filed a motion for partial summary judgment on Plaintiff's § 1983 claims, retaliation claims, and aiding and abetting claims. (City Defs. Mot. (Dkt. 44), Marecki Mot. (Dkt. 39).) The City Defendants have not moved for summary judgment on Plaintiff's Title VII, NYSHRL, and NYCHRL hostile work environment claims against the City. Marecki filed a separate motion for summary judgment on Plaintiff's claims against him for aiding and abetting the City's hostile

9

work environment and retaliation. Plaintiff opposes both mo-
tions. (Campo Marecki Opp. (Dkt. 51), Campo City Opp. (Dkt.
52).)

## II.   STANDARD OF REVIEW

A court must grant summary judgment when "the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). "A 'material' fact is one capable of influencing the case's
outcome under governing substantive law, and a 'genuine' dis-
pute is one as to which the evidence would permit a reasonable
juror to find for the party opposing the motion." *Figueroa v.
Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Upon proper motion, a
movant is entitled to an entry of summary judgment "against a
party who fails to make a showing sufficient to establish the ex-
istence of an element essential to that party's case, and on which
that party will bear the burden of proof at trial." *El-Nahal v. Yas-
sky*, 835 F.3d 248, 252 (2d Cir. 2016). "The mere existence of a
scintilla of evidence" in support of the non-movant is insufficient
to defeat a summary judgment motion. *Anderson*, 477 U.S. at
252.

In determining whether an issue is genuine, "[t]he inferences to
be drawn from the underlying affidavits, exhibits, interrogatory
answers, and depositions must be viewed in the light most favor-
able to the party opposing the motion." *Cronin v. Aetna Life Ins.
Co.*, 46 F.3d 196, 202 (2d Cir. 1995). "[T]he judge's function is
not [] to weigh the evidence and determine the truth of the mat-
ter but to determine whether there is a genuine issue for trial."
*Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012).
However, "[a] party may not rely on mere speculation or conjec-
ture as to the true nature of the facts to overcome a motion for
summary judgment," and "[m]ere conclusory allegations or de-
nials . . . cannot by themselves create a genuine issue of material

fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d
159, 166 (2d Cir. 2010).

## III. DISCUSSION

### A. Claims Against the City

Plaintiff contends that the City, in its capacity as her employer,
retaliated against her and created a hostile work environment,
giving rise to claims under Title VII, § 1983, the NYSHRL, and
the NYCHRL. (Compl. ¶¶ 63-66; Campo City Opp. (Dkt. 52-31)
at 15.) The City moves for summary judgment on Plaintiff's re-
taliation claims, but not her hostile work environment claims.
Plaintiff also argues that the City, in its capacity as a municipality,
is liable for Plaintiff's constitutional injuries under § 1983 accord-
ing to a *Monell* theory of liability. The City moves for summary
judgment on Plaintiff's *Monell* claim. (City Defs. Mot. (Dkt. 47)
at 3.)

1. Retaliation Under Title VII, § 1983, the NYSHRL,
   and the NYCHRL

A plaintiff claiming retaliation for objecting to prohibited em-
ployment discrimination is required to present a *prima facie* case
comprising four elements, *i.e.*, "that (1) she engaged in protected
activity, (2) the defendant was aware of that activity, (3) the
plaintiff suffered an adverse employment action, and (4) there
was a causal connection between the protected activity and the
adverse employment action." *Davis-Garett v. Urban Outfitters,
Inc.*, 921 F.3d 30, 43 (2d Cir. 2019). The harm element of a re-
taliation claim "is not to be analyzed in the same way as the harm
from an alleged substantive act of discrimination," because Title
VII's "antiretaliation provision, unlike the substantive provision,
is not limited to discriminatory actions that affect the terms and
conditions of employment." *Id.* (citing *Burlington Northern &
Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)). Rather, a

11

plaintiff may recover for retaliation by "show[ing] that a reasonable employee would have found the challenged action *materially adverse*, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*

The elements of retaliation claims brought against employers under § 1983 or the NYSHRL mirror those under Title VII. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015). By contrast, NYCHRL claims "must be analyzed separately and independently from federal and state discrimination claims." *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 112-13 (2d Cir. 2013). The NYCHRL's retaliation provision must be interpreted broadly and provides liability for conduct not covered by its federal and state counterparts. *Id.*

In its brief, the City characterizes Plaintiff's retaliation claim as based on allegations that, *as a result of her April 2018 complaint to Inspector Holmes*, Holmes removed Plaintiff from the NCO program, gave her "undesirable" shifts and tasks, and denied her a transfer to the Harbor Summer Detail Unit. (City Mot. at 12-14; Compl. ¶¶ 44-57.) The City thus moved for summary judgment on the basis that Plaintiff was removed from the NCO program and given undesirable tasks *before* she filed a complaint in April 2018. The City also argued that, in any case, the removal was not materially adverse; that her assignment to allegedly "undesirable" shifts and tasks was not caused by her protected activity; and that there were non-retaliatory reasons for denying her transfer application. (*See* City Defs. Mot. at 12-14.)

Plaintiff's opposition, however, clarified that the focus of her retaliation claims are allegations that she was removed from the NCO program as a result of her *prior* complaints; or alternatively as a result of *Mercado's* retaliatory animus; that she was harassed by Marecki and Mercado in a way that constitutes retaliation;

and that Holmes and the City's refusal to separate her from her harassers constitutes retaliation. (Campo City Opp. at 17-20.)

The court addresses these theories in turn, in two categories: first, considering the allegedly retaliatory employment actions Campo faced, including her removal from the NCO program and her change in assignments; and second, considering the retaliatory harassment she allegedly faced from co-workers.

a.   *Retaliatory Removal from the NCO Program and Assignments Thereafter*

The City Defendants' first basis for summary judgment is that Campo's removal from the NCO program and allegedly unfavorable assignments cannot have occurred in retaliation for Campo's complaint to Holmes, because the removal and assignments occurred *before* she complained to Holmes. (City Defs. Mot. at 12-13.) Though factually sound, this argument is a straw man, as Plaintiff has never argued that the removal and unfavorable assignments were caused by her complaint to Holmes. Rather, her complaint alleged that the removal and assignments occurred in retaliation for her "numerous" prior complaints to Ringel and Foley (and perhaps for her anonymous complaint to the IAB), which Holmes knew about. (*See* Compl. ¶¶ 44-48; Campo City Opp. at 12, 21.) Even if Holmes didn't know, Plaintiff offers an additional explanation for her removal from the NCO program: that Mercado, with retaliatory animus, manipulated Holmes and the City into removing Campo and giving her unfavorable assignments. (Campo City Opp. at 17-21.) Plaintiff contends that, because it acted as a conduit for Mercado's animus, the City is liable for retaliation under the "cat's paw" doctrine. (*Id.*)

i.   Retaliation by Holmes for Prior Complaints

The court first considers whether Plaintiff has adduced evidence sufficient to support a finding that Holmes removed her from the NCO program, and gave her undesirable assignments thereafter,

in retaliation for her prior complaints of sexual harassment. But
such a finding would presuppose that Holmes was *aware* of Plain-
tiff's prior complaints – a fact that Holmes denied at the time and
at her deposition. (*See* Audio Recording (Campo City Opp. Ex.
11) (Dkt. 52-18); Campo Ex. 22; Holmes Dep. (Dkt. 51-3) 49:4-
53:5.)

When initially referring Plaintiff's complaint to IAB, Holmes ex-
pressed surprise, saying "[Campo] has come into my office since
I've been here for two years. She will talk about her brother, her
haircut, and never once mentioned this. She has to go speak to
someone because something is not right with me." (Campo Ex.
11; *see also* Campo Aff. ¶ 51.) At deposition, Holmes elaborated:

> [S]he comes to me and like I said we talk about every-
> thing from a hair cut to whatever and like she is in my
> office often enough that if you went to two sergeants
> and they didn't help you that you absolutely can come
> to me and she never said anything to me about being
> harassed or no one helping her or anything to that ef-
> fect. . . . I found it very hard to believe . . . . I couldn't
> understand like from reading the e-mail how you even
> tolerated this for that period of time [without reaching]
> out to EEO, IAB or me other than the two supervi-
> sors. . . . That's my whole thing is that why she didn't
> want to come to me but you go to two men . . . . So
> maybe you felt comfortable with Foley or Ringel but if
> you felt they didn't help you why not call EEO or IAB or
> speak to me or Lieutenant Calahee.

(Holmes Dep. 50:11-53:5.)

Holmes's expressions of surprise and disbelief underscore her de-
nial of prior knowledge of Campo's harassment and complaints.
Moreover, Campo herself admits that Sergeants Foley and Ringel
never relayed her complaints "up the chain of the command" to

Holmes or anyone else – indeed, that alleged failure is an essential part of her claims against them. (Campo City Opp. at 5, 8.) It is thus unclear how, as Plaintiff contends, Holmes would have been aware of her prior complaints to Foley and Ringel (or that she "anonymously" complained to IAB), such that those complaints could have caused Holmes's decision to remove her from NCO. Moreover, Campo alleges that she first complained to Foley in 2013 or 2014 and to Ringel in 2016, so she cannot rely on "temporal proximity" to show that these complaints caused her removal in April 2018. *See Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

Plaintiff argues only that Holmes's retaliatory motive for the removal and subsequent unfavorable assignments can be inferred from the fact that there was no "legitimate business reason" for Campo's removal from NCO nor "explanation" for her unfavorable assignments, and from the fact that "the reasons provided by Holmes" for the removal "were entirely inconsistent with Mercado's testimony and common sense." (Campo City Opp. at 12.) Ostensibly, Campo was being removed because community members had complained that Campo was not answering phone calls. (Campo Counterstatement to City 56.1 ¶¶ 31-32.) The officer who reported this allegation to Holmes was Campo's NCO partner and alleged harasser: Mercado. (Campo Aff. ¶ 43; Holmes Dep. 15-16, 31-33; Mercado Dep. 13, 27-28, 31-33.)

Plaintiff points to various inconsistencies in Holmes's account, but these inconsistencies have little directly to do with Holmes's knowledge of Campo's prior complaints to Foley and Ringel, and do not suffice to show that Campo's removal from NCO resulted from Holmes's retaliatory animus. Nor does the fact that Campo was unable to show her phone to disprove the allegation of missed phone calls. Nothing in the record challenges Holmes's consistent stance that she did not know about the complaints to Foley or Ringel (or about any other protected activity that Campo

engaged in). Thus, a reasonable jury could not find that, before Campo complained directly to her, Holmes was somehow already aware of Campo's prior complaints, harbored retaliatory animus about them, and acted on that animus by removing her from the NCO program and assigning her to unfavorable tasks. *See Sardina v. UPS*, 254 F. App'x. 108, 110 (2d Cir. 2007) (granting summary judgment to defendants where "plaintiff[s] provide[d] no evidence to establish that the supervisor who allegedly retaliated against her [] knew about her complaint or that there was any connection between her complaint" and her allegedly unfavorable assignments).

The court rejects this theory under the NYCHRL as well, notwithstanding its more liberal standard. Even under the NYCHRL's scope, which is broader than its federal and state counterparts, a plaintiff still must "prove the conduct is caused at least in part by [] retaliatory motives." *Mihalik*, 715 F.3d at 113. Because Holmes was then unaware of Campo's complaints, the NYCHRL's more expansive standard cannot save this theory.

ii.        "Cat's Paw" Liability

The court next considers Plaintiff's "cat's paw" theory of liability. The Second Circuit first embraced the cat's paw theory in *Vasquez v. Empress Ambulance Service, Inc.*, 835 F.3d 267 (2d Cir. 2016). The theory applies in "a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Id.* at 272. "Because the supervisor, acting as agent of the employer, has permitted himself to be used as the conduit of the subordinate's prejudice, that prejudice may then be imputed to the employer and used to hold the employer liable for employment discrimination." *Id.* Under a cat's paw theory, an employer may only be held liable if the ultimate decisionmaker was negligent

in relying on a biased subordinate's allegations although it knew (or reasonably should have known) of the subordinate's discriminatory motivation. *Id.* at 274.

The facts of *Vasquez* demonstrate a vivid example of such negligent reliance. There, the employer knew or should have known of the discriminatory motivation primarily because the biased subordinate, Gray, proffered his accusations only after the accused, Vasquez, had accused *him* of sexual harassment. *Id.* Additional factors demonstrated reason for skepticism, including the fact that the evidence Gray proffered showed that he had apparently eagerly participated in the racy text conversation before reporting it as unwelcome harassment. *Id.* The supervisory decisionmaker nonetheless "chose to ignore these warning signs and instead blindly credited Gray's assertions, obstinately refusing to inspect Vasquez's phone or to receive any other evidence proffered by Vasquez in refutation." *Id.*

Plaintiff argues that cat's paw liability applies here because Holmes negligently allowed herself to be manipulated by Mercado, who made false claims about Plaintiff's job performance "[i]n retaliation for Plaintiff's rejection of his sexual advances" in order to "rid himself of Plaintiff." (Campo City Opp. at 21.) In order for Plaintiff to establish her cat's paw retaliation claim, she must first establish that the biased subordinate – in this case Mercado – acted with retaliatory animus.

In general, a finding of retaliatory animus requires a showing that the alleged adverse action was undertaken in response to a "protected activity," *e.g.*, a charge of sexual harassment. *See Equal Opportunity Emp't Comm'n v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 423 (E.D.N.Y. 2016); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). In *Vasquez*, the court found that the subordinate's retaliatory intent had been plausibly pled because the complaint alleged "(1) Gray desired his actions to cause, or knew that his actions

17

were substantially certain to result in, adverse employment action for Vasquez, and (2) he took those actions because she had made a charge of sexual harassment, *i.e.*, he would not have taken those actions if Vasquez had not filed a complaint with human resources." *Vasquez*, 835 F.3d at 272 n.4.

In this case, it is undisputed that, at the time Campo was removed from the NCO program and given unfavorable assignments, she had not yet made a formal or informal charge of sexual harassment against Mercado. Rather, Plaintiff alleges that Mercado acted "in retaliation for" her rejection of his sexual advances. (Campo City Opp. at 15-16.) Plaintiff argues that this rejection constitutes a "protected activity" akin to a charge of sexual harassment. (*Id.*) In support of this argument, Plaintiff cites a number of cases holding that rejection of a supervisor or employer's sexual advances constitutes a protected activity. (*Id.* at 17.) Plaintiff supposes that these cases also support the proposition that rejection of a *co-worker's* advances is a protected activity.

The Second Circuit has not decided whether rejection of a supervisor or employer's sexual advances constitutes a protected activity, but the majority of courts to face the issue have agreed that it does. *See, e.g.*, *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 447-48 (S.D.N.Y. 2018) (collecting cases); *Little v. NBC*, 210 F. Supp. 2d 330, 385-86 (S.D.N.Y. 2002) (collecting cases and noting that the Second Circuit has not addressed the issue); *Johnson v. Medisys Health Network*, No. 10-cv-1596 (ERK) (WP), 2011 WL 5222917, at *16 (E.D.N.Y. June 1, 2011). These decisions reason that the intent of the prohibition against retaliation – to protect employees who oppose unlawful workplace discrimination – is furthered by considering refusal of an employer's advances to be a "protected activity," because, after all,

"[s]exual harassment by an employer or supervisor is an unlawful practice, and an employee's refusal is a means of opposing such unlawful conduct." *Hughes*, 304 F. Supp. 3d at 448.

Other courts, by contrast, have held that rejecting sexual advances cannot constitute a protected activity, reasoning that "if resisting the advances of a harasser constitutes a protected activity, then 'every harassment claim would automatically state a retaliation claim as well.'" *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 189 (E.D.N.Y. 2012); *Del Castillo v. Pathmark Stores, Inc.*, 941 F. Supp. 437, 438-39 (S.D.N.Y. 1996). These decisions assert that their holdings are consistent with the intent of the prohibition against retaliation – "preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [an anti-discrimination statute's] basic guarantees" – because "if one makes no effort to secure or advance the guarantees of an anti-discrimination statute by taking any action in response to allegedly discriminatory conduct, there can be nothing for the employer to interfere with." *Reid*, 876 F. Supp. 2d at 189.

The majority position (*i.e.*, that refusal does constitute protected activity) faults the minority approach for "overlook[ing] the complex dynamics underlying a work environment fraught with power disparities." *Hughes*, 304 F. Supp. 3d at 448. In *Hughes*, Judge Pauley explained that "[f]ormally reporting an incident of sexual assault [by a supervisor] is not always available" as a remedy for a subordinate, because the harassed subordinate "faces a Hobson's choice – she is either forced to endure her supervisor's unwanted overtures, or file a complaint that will inevitably bruise his ego and jeopardize her job and career." *Id.* The court agrees with that majority position; not every harassment claim automatically states a retaliation claim because plaintiffs still must demonstrate that they resisted unlawful conduct and had good reason not to do so formally.

19

In this case, Plaintiff's alleged harasser/retaliator – Mercado – was her co-worker, not her direct supervisor. But it would be overly formalistic to rely on that distinction alone to categorically reject the possibility that Campo's resistance of Mercado's advances could not constitute protected activity.

There are strong reasons to believe that, when an employee rejects their supervisor's sexual advances, subsequently unfavorable treatment can scarcely be disentangled from the rejection – whether or not a formal complaint was filed. The rejection may be tantamount to a complaint. As *Hughes* explained, this is especially true where hierarchical "power disparities" exist. In such situations, courts should consider the totality of the circumstances presented by the particular workplace dynamics. *See, e.g.*, *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 86 (E.D.N.Y. 2020) (finding protected activity where plaintiff "harbored a fear that formally resisting . . . would have devolved into a 'he said, she said' . . . with little prospect of anyone taking her side, and a severe risk of repercussions"). In this case, the particular nature of a police department – where officers work closely together, often in partnership, and frequently in reliance on one another to protect each other's lives – could similarly give rise to a "Hobson's choice." That consideration should apply to co-worker and supervisory relationships alike. Especially combined with the gender imbalances common in police precincts, the court is not prepared to conclude that Campo's rejection of Mercado, as a matter of law, could never constitute protected activity.

Nonetheless, the court must reject Plaintiff's cat's paw theory. Though Holmes may have been negligent in handling Mercado's report, in the sense that she did not offer Campo a chance to contest his allegations, Holmes nonetheless did not know, nor reasonably should she have known, that Mercado's report was tainted by retaliatory animus. *Vasquez*'s holding suggests that

mere negligence in handling the tainted report does not suffice to establish cat's paw liability. Instead, the panel explained that the employer must be negligent to the specific risk that the subordinate's report was tainted by discriminatory or retaliatory animus. *See Vasquez*, 835 F.3d at 275 ("we conclude that [plaintiff] has pled facts from which a reasonable person could infer that [the employer] knew or should have known that [the subordinate's] accusations were the product of retaliatory intent and thus should not have been trusted"); *see also Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 (2d Cir. 2019) (cat's paw "principles provide for liability where the employer was negligent because it acted at the agent's behest *when it knew or should have known of the agent's discriminatory motivation*") (emphasis added). Plaintiff has adduced no evidence that, at the time of Campo's removal, before complaining to Holmes, Holmes knew or should have known of Mercado's alleged sexual assault, *see* Part III.A.1.a, nor has Plaintiff shown that Mercado's allegedly tainted report to Holmes exhibited the obvious "warning signs" that suggest retaliatory animus. *Cf. Vasquez*, 835 F.3d at 274. The court need not reach Defendants' arguments that Campo's removal from the NCO program and subsequent assignments did not constitute "adverse employment action."

Campo's added claim under the NYCHRL fails for the same reason. Although the NYCHRL's more expansive scope might lead the court to accept Campo's interpretation of protected activity (an otherwise close call), it cannot save her failure to adduce any evidence that Holmes was in thrall to Mercado's manipulation.

    b.  *Retaliatory Harassment from Co-Workers Following April 2018 Complaint*

Plaintiff next argues that "the ongoing hostile comments and conduct" from Marecki and Mercado "were sufficiently hostile and threatening to dissuade a reasonable employee from reporting discrimination" and thus constitute retaliation. (Campo City

Opp. at 19.) Plaintiff also argues that, after she complained to Holmes, the EEO, and the IAB, Holmes and the City "required" her and her harassers "to work together, which resulted in ongoing torment with gender-based taunts whenever they saw her." (*Id.*) Plaintiff does not allege that Holmes or the City affirmatively sought to assign her to shifts with Marecki and Mercado; rather, the basis of her claim is that "Defendants never took any steps to separate Plaintiff from either of her harassers." (*Id.* at 23.)

In *Richardson v. New York State Dep't of Corr. Serv.*, the Second Circuit held that "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the [harm] prong of the retaliation *prima facie* case." 180 F.3d 426, 446 (2d Cir. 1999); *accord Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 26-27 (2d Cir. 2014). The panel explained that "[j]ust as an employer will be liable in negligence for a racially or sexually hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriate remedial action, so too will an employer be held accountable for allowing retaliatory co-worker harassment to occur if it knows about that harassment but fails to act to stop it." *Richardson*, 180 F.3d at 446.

As to what constitutes "sufficient severity," the Supreme Court has since clarified that Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment," but rather, a plaintiff may recover for retaliation by "show[ing] that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 64, 68.

Plaintiff has adduced evidence sufficient to allow a reasonable jury to find that her co-workers' retaliatory harassment was sufficiently severe as to meet this standard. There is no dispute that Campo's April 2018 EEO and IAB complaint constitutes a protected activity, and she has adduced evidence sufficient to allow a reasonable jury to find that her co-workers' retaliatory harassment was sufficiently severe. Campo testified that Marecki and Mercado's harassing conduct worsened after she filed this complaint, to the extent that they directed sexually charged slurs at her "almost every time [she] saw either of them," which was "at least twice a week, likely much more."[2] (Campo Aff. ¶ 76; Campo Dep. at 27-28, 142-44, 149-51, 153.) Some of these comments are documented in Campo's memo book, and Campo also reported them via email to IAB. (*See generally* Campo Ex. 2; Campo Ex. 17; Campo Ex. 18, D004554, D002316.) Moreover, a fellow officer confirmed that Marecki accused Campo of being a "homewrecker" and having "slept with married men." (Campo Aff. ¶ 96; Campo Ex. 19.)

Other officers besides Marecki and Mercado allegedly contributed to the retaliatory harassment against Campo. Campo and her co-worker Meghan Ciotti both testified that, after Campo complained, Officer Richardson chastised her, indicating that she would be labeled a "rat" and that other officers might not help her if she made a call for help in a dangerous situation. (Campo Aff. ¶¶ 52-53; Ciotti Aff. (Dkt. 52-7) ¶ 16; *see also* Campo Ex. 19; Campo Dep. at 75-76; Campo Ex. 13.) In May 2018, Campo's locker was broken into and her memo book and baton went missing; she attributed this incident to retaliatory animus. (Campo Aff. ¶ 55; Campo Dep. at 124-31; Campo Ex. 2.) Campo testified

---

[2] These slurs included: "slut," "dirty slut," "homewrecker," "whore," "dirty whore," "bitch," "stupid bitch," "fat bitch," "fucking bitch," "cunt," "thundercunt," "fat ass," and "fucking skank." (Campo Aff. ¶¶ 14, 75-76, 82, 89, 92-93, 101, 106, 111, 113.)

that she complained about this incident to Holmes, who responded with "words to the effect of, 'Enough with this shit, your locker wasn't broken into, retaliation can only come from those named in the EEO complaint, get out of my office.'" (Campo Dep. at 124, 131; Campo Ex. 2.)

A reasonable jury could find that Holmes's conduct contributed to the retaliatory harassment. Campo testified that, after initially complaining to her in April 2018, Holmes, with whom Campo had previously been friendly, "gave me the cold shoulder" and "never looked at or spoke to me again except for" her hostile response to Campo's reporting the locker incident. (Campo Aff. ¶ 50; Campo Dep. at 120, 122-23.) In private, at least to the EEO and IAB, Holmes, in response to Campo's complaint, described Campo as requiring "psych services." (Campo Ex. 11; Campo Aff. ¶ 51.) Finally, Campo also testified that, in response to her complaint, she was subjected to atypically frequent drug tests, which she attributes to retaliation. (Campo Ex. 17; Campo Aff ¶ 98; Campo Dep. 151-52.)

In sum, this evidence more than suffices to permit a reasonable jury to find that Campo was subjected to "unchecked retaliatory co-worker harassment" that was "sufficiently severe" that it "could well have dissuaded a reasonable employee in [Campo's] position from complaining of unlawful discrimination." *See Rivera*, 743 F.3d at 26-27 (noting that a supervisor's hostile, dismissive response to plaintiff's harassment complaint suffices to establish a *prima facie* retaliation claim). Because Plaintiff has made a showing sufficient to satisfy Title VII's narrower standard for liability, the court need not independently analyze whether she has satisfied the NYCHRL's broader standard, as it is satisfied *a fortiori*. Accordingly, Defendants' motion for summary judgment on Plaintiff's retaliation claims against the City under Title VII, § 1983, the NYSHRL, and the NYCHRL are all DENIED.

c.    *Conclusion*

In summary, the court rejects Plaintiff's theory alleging retaliatory employment actions regarding her removal from the NCO program and her change in assignments. The court also rejects Plaintiff's cat's paw theory. But it concludes that her theory alleging retaliatory harassment, inasmuch as it dissuaded her from making a charge of discrimination, may be tried. The City's motions for summary judgment on the retaliation claims – under Title VII, § 1983, the NYSHRL, and the NYCHRL – are all therefore DENIED.

2.    *Monell* Claims

The court construes Plaintiff's complaint as also raising three *Monell* theories against the City. (*See* Compl. ¶ 63; Campo City Opp. at 2-10.) These claims are based on allegations that the City violated Plaintiff's constitutional rights through its (1) adoption of a *de facto* policy or custom by a widespread practice; (2) failure to train its employees; and (3) failure to investigate and respond adequately to Campo's complaints, creating a failure to supervise and discipline its officers.[3] (*See* Campo City Opp. at 2-10.) *See also Jackson v. Nassau Cty.*, No. 18-cv-3007 (JS) (AKT), 2021 WL 3207168, at *16 (E.D.N.Y. July 28, 2021).

The City Defendants argue first that Plaintiff's policy or custom theory fails because she has not pleaded the existence of an affirmative municipal policy, and that in any case Ringel, Foley, Holmes, and Mercado are not cognizable "policymakers" within the meaning of *Monell*. (City Defs. Mot. at 3-5.) Second, the City Defendants argue that Plaintiff's failure to train theory fails because she has not identified specific deficiencies in the NYPD's EEO training program. (*Id.* at 7-8.) Third, the City Defendants argue that Plaintiff's failure to supervise theory fails because the

---

[3] Campo does not allege the existence of a formal, affirmative municipal policy that caused her harassment.

investigation and remedy provided by the EEO and IAB was not so inadequate as to constitute deliberate indifference. (*Id.* at 5-6.)

Municipalities cannot be vicariously liable under § 1983 for their employees' acts. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978). Instead, municipalities may be liable for "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). A plaintiff may demonstrate that a policy or custom exists by introducing evidence of one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Alwan v. City of New York*, 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2018). To prevail on a *Monell* claim, a plaintiff must show that "there is a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation" she suffered. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

### a.   *De Facto Policy or Custom*

Campo alleges that "the practice of harassment and retaliation was so persistent and widespread" that it constitutes "actual and/or constructive acquiescence of policymakers." (Campo City

Opp. at 4-5; Compl. ¶ 63(a).) To demonstrate a *de facto* policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). A plaintiff "may adequately plead the existence of *de facto* customs or policies based on governmental reports documenting constitutional deficiencies or misconduct," *Felix v. City of New York*, 344 F. Supp. 3d 644, 658 (S.D.N.Y. 2018) (collecting cases), if such reports are "sufficiently connected to the specific facts of the case," *Gomez v. City of New York*, No. 16-CV-1274 (NGG) (LB), 2017 WL 1034690, at *11 (E.D.N.Y. Mar. 16, 2017). A plaintiff may also plead the existence of *de facto* customs or policies "by citing to complaints in other cases that contain similar allegations." *Gaston v. Ruiz*, No. 17-CV-1252 (NGG) (CLP), 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018). Such complaints must involve factually similar misconduct, be contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability.

As to sexual harassment, the court concludes that a reasonable jury could not find that it pervaded the Department. Although Campo has adduced evidence regarding the harassment she allegedly experienced from Marecki and Mercado, she has not offered evidence regarding other instances of sexual harassment in other precincts, by other harassers, or involving other victims. *See Jallow v. City of New York*, No. 21-1267, 2021 WL 5121130 (2d Cir. 2021) ("[T]hat individual NYPD officers discriminated against him and violated his rights . . . does not suffice to plausibly allege the existence of a sanctioned City policy or custom that caused [plaintiff's] alleged injuries.").

Likewise, a reasonable jury could not find that retaliation pervaded the Department. Evidence regarding Campo's own

experience does not suffice to establish a *de facto* policy or custom. The only other evidence regarding retaliation consists of testimony from Campo and her co-worker Meghan Ciotti that Officer Richardson, "the most senior officer in the precinct" in terms of experience but not a policymaker, warned Campo of a department-wide custom of retaliating against officers who file complaints. (*See* Campo Aff. ¶ 52.) Richardson allegedly told Campo, "People like you, they're considered to be rats," and he then cited a prior incident of retaliation he had witnessed in a different precinct in which "there was a similar situation and this person called [for help] and, you know, we all took our time getting there so that he would get his ass whooped." (*Id.*) Richardson's observations, standing alone, do not suffice to allow a reasonable jury to conclude that retaliatory conduct pervaded the NYPD. *See Isaac v. City of New York*, 16-cv-4729 (KAM), 2018 WL 5020173, at *17 (finding that other court cases could not establish a *de facto* policy or custom because they involved dissimilar misconduct, were resolved by settlement, or the city prevailed); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) ("None of the [sixteen] lawsuits cited resulted in an adjudication or admission of liability and the number of suits does not suggest a pervasive illegal practice."). Moreover, even if Richardson's conclusion that "People like you, they're considered [by co-workers] to be rats" is credited, it does not follow that a City policymaker was necessarily aware of that allegedly widespread retaliation. *Cf. Amnesty America*, 361 F.3d at 126. As such, a reasonable jury could not find the City liable for a *de facto* policy or custom of retaliation.

### b.   Failure to Train

The court next considers Plaintiff's theory that the City exhibited deliberate indifference to Plaintiff's rights by failing to properly train its employees. (*See* Campo City Opp. at 5-8.) When a *Monell* claim relies on the theory that the municipality failed to

"train certain employees about their legal duty to avoid violating [individuals'] rights," the plaintiff must show that the "municipality's failure to train its employees in a relevant respect . . . amount[ed] to deliberate indifference to the rights of persons with whom the [untrained employees] came into contact." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In this context, "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* To establish that a municipality acted with deliberate indifference for purposes of a failure to train claim, a plaintiff must meet three requirements:

> First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation. Thus, a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events.

> Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. . . .

> Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. Thus, municipal policymakers may appropriately concentrate training and supervision resources on those situations where employee misconduct is likely to deprive citizens of constitutional rights.

*Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). To survive a motion for summary judgment, the plaintiff must "identify a specific deficiency in the city's training program and

establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007). Moreover, the plaintiff must "ordinarily" show "[a] pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62.

The City insists that the NYPD's required EEO training program adequately addressed sexual harassment, discrimination, and retaliation. (City Defs. 56.1 ¶ 41.) They note that the program includes interactive online computer module programs, and that Marecki, Mercado, Foley, and Ringel completed modules as recently as January 2018. (*Id.* at ¶¶ 42-43.) Plaintiff fails to identify any specific deficiency in this program that actually caused her constitutional deprivation. (*See* Campo Counterstatement to City 56.1 ¶¶ 42-43.) Instead, Plaintiff accepts the City's characterization of its program but, in a conclusory fashion, casts it as inadequate. (*Id.* ¶ 42.) The program's online nature does not *per se* constitute a "specific deficiency," and Plaintiff has adduced no evidence as to the contents of the training program. Plaintiff's failure to train theory is not saved by the circular inference that "the existence of the narrative of this case evidences . . . [a] failure to train." (*Id.*; *see* Campo City Opp. at 5-7.) The Second Circuit has made it clear that "[a] training program is not inadequate merely because a few of its graduates deviate from what they were taught." *Jenkins*, 478 F.3d at 95.[4]

---

[4] Plaintiff alternatively argues that the City should be liable for failing to *retrain* Marecki, Mercado, Foley, and Ringel after she formally complained about them to the IAB and EEO in April 2018. (*Id.* ¶ 43.) As explained below, Plaintiff has not established that the City's response to Plaintiff's complaints constitutes deliberate indifference. As such, the City's decision not to retrain these officers, which is just one aspect of its entire response to her complaints, cannot constitute deliberate indifference either.

        *c.*     *Failure to Supervise*

A § 1983 plaintiff "may establish the pertinent custom or policy
by showing that the municipality, alerted to the possible [consti-
tutional violation], exhibited deliberate indifference." *Vann v.
City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). "To prove
such deliberate indifference, the plaintiff must show that the
need for more or better supervision to protect against constitu-
tional violations was obvious." *Id.* "An obvious need may be
demonstrated through proof of repeated complaints of civil rights
violations." *Id.*; *see also Fiacco v. City of Rensselaer*, 783 F.2d 319,
328 (2d Cir. 1986). If a municipality does respond to the com-
plaints, plaintiffs face "a heavy burden of proof in showing that
the . . . response was so patently inadequate to the task as to
amount to deliberate indifference"; such inadequacy must reflect
"a deliberate choice among various alternatives, rather than neg-
ligence or bureaucratic inaction." *Reynolds v. Giuliani*, 506 F.3d
183, 192-93 (2d Cir. 2007). Plaintiffs must also prove that the
municipality's deliberate indifference "actually caused or was the
moving force behind the alleged violations." *Id.*

Plaintiff argues that the City exhibited deliberate indifference in
failing to remedy persistent harassment and retaliation against
her, which she complained about numerous times. (Campo City
Opp. at 2-5, 8-10.) As an initial matter, Defendants argue that
the City cannot be held liable for failing to respond to Plaintiff's
complaints because the complaints reached no further than pre-
cinct supervisors, EEO staff, and IAB investigators. (City Defs,
Mot. at 4-6.) Defendants are correct that none of these individu-
als were "municipal policymakers" such that their knowledge of
the harassment can automatically be imputed to the City. *See Lit-
tlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015)
(holding administrative chief of staff "was not a final municipal
policymaker" such that her personnel decisions "could be said to
represent official City policy"); *Soto v. Schembri*, 960 F. Supp.

751, 759 (S.D.N.Y. 1997) (noting that "[t]he New York City Charter vests final policymaking authority in the Mayor and City Council"). But Plaintiff contends that the harassment against her was so significant, and her complaints about it so numerous, that there was an obvious need for the City to take remedial steps. (*See* Campo City Opp. at 2-5, 8-9.) Indeed, even though these officials are not policymakers, their actions nonetheless could come to the attention of policymakers.

A large number of formal complaints evidencing a pattern of constitutional violations may suffice to alert City policymakers to the risk of repeated violations. *See Alwan*, 311 F. Supp. 3d at 583-84. In this case, however, Plaintiff filed only one formal complaint to IAB, though she also filed two criminal complaints.[5] It is not clear whether these complaints can be said to have alerted City policymakers to the allegations they contained. But even if they did, a reasonable jury could not find that the complaints, in and of themselves, demonstrated an "obvious need for more or better supervision," because, until the IAB had a chance to investigate Campo's allegations and determine their authenticity, the need for more or better supervision cannot be described as "obvious." The very purpose of an internal investigation is to determine how to respond to and remedy allegations of internal misconduct.

Plaintiff also argues that the IAB investigation *itself* constitutes deliberate indifference to the ongoing harassment she faced from Marecki and Mercado, because it was a "sham investigation" that was unnecessarily drawn out over the course of a year. (Campo City Opp. at 10.) Defendants reject this argument on the basis that the investigation did not exhibit deliberate indifference, and that, in any case, the IAB is not a "municipal policymaker" such that its deliberate indifference can be imputed to the City. Even

---

[5] The fact that Campo filed this civil suit is not relevant here, because this suit was filed after she suffered her workplace injuries. She has been on medical leave since before the suit was filed.

assuming that Plaintiff is correct and the IAB is a municipal poli-
cymaker for purposes of *Monell* liability, the court would deny
Plaintiff's *Monell* claim against the City on the basis that the in-
vestigation did not exhibit deliberate indifference. Four months
after Campo's complaint, the IAB offered her a transfer, which
she declined, on the basis that it would be "unfair" for her to have
to move, rather than her harassers. (Campo Counterstatement to
City 56.1 ¶¶ 37-38; Campo Aff. ¶ 79.) Though that offer may not
have been the best possible remedy for Campo, she has not
shown that it was "so patently inadequate to the task" of prevent-
ing her injuries "as to amount to deliberate indifference."
*Reynolds*, 506 F.3d at 192-93. Thus, though the IAB's allegedly
lax investigation may have even exhibited "negligence" or "bu-
reaucratic inaction," Plaintiff has not satisfied her heavy burden
of proof in showing that the City exhibited deliberate indifference
to her injuries.

#### d.   Conclusion

In summary, the court rejects all of Plaintiff's *Monell* theories. The
City's motion for summary judgment on the *Monell* claim is there-
fore GRANTED.

### B.   Claims Against the Individual Defendants

Plaintiff next asserts claims against the individual defendants.
First, Plaintiff argues that, because their supervision of Marecki
and Mercado was grossly negligent, her supervisors are liable un-
der § 1983 for the constitutional injuries caused by Marecki and
Mercado. (Compl. ¶ 62; Campo City Opp. at 10-15.) Second,
Plaintiff claims that the individual defendants are all liable for
aiding and abetting the City's retaliation and hostile work envi-
ronment under the NYSHRL and NYCHRL because they
"participat[ed] in and/or [were] aware of such conduct and

fail[ed] to remediate same." [6] (Compl. at ¶¶ 64, 66; Campo City Opp. at 24-25.)

### 1.   Section 1983 Claims

The complaint alleges that Inspector Janice Holmes and Sergeants Brian Foley and John Ringel are liable for Campo's constitutional injuries under § 1983 because (1) their supervision of Officers Marecki and Mercado was grossly negligent, and (2) they retaliated against her. (Compl. ¶ 62.) The City Defendants move for summary judgment on Plaintiff's supervisory liability claims, arguing that a reasonable jury could not find Holmes or Foley grossly negligent; that the claims against Foley are in any case barred by statutes of limitations; and that a reasonable jury could not find a "causal link" between Ringel's inaction and Campo's harassment. (City Defs. Mot. at 9-10.) The City Defendants also move for summary judgment on all of Plaintiff's retaliation claims. (*Id.* at 11-14.) Plaintiff's brief in opposition defends her supervisory liability claims but does not mention or attempt to substantiate any § 1983 retaliation claims against the individual defendants. In any event, the City Defendants argue that the court need not reach the merits of the individual defendants' liability, because they are protected by qualified immunity. (*Id.* at 10-11.)

### a.   *Qualified Immunity*

In deciding "questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first prong "asks whether the facts, taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a federal

---

[6] Though the complaint alleged that the City subjected Plaintiff to "sexual harassment" *and* "a hostile work environment," Plaintiff's briefs do not treat these two claims as distinct, instead focusing only on the elements of a hostile work environment claim. (*See* Campo Marecki Opp. at 2-10; Campo City Opp. at 24-25.)

right[,] . . . [and] [t]he second prong of the qualified immunity analysis asks whether the right in question was clearly established at the time of the violation." *Id.* at 655-56. Officials operating under color of state law are thus entitled to summary judgment "when they can establish that either (1) a constitutional right was [not] violated or (2) the right was not clearly established [at the time of the violation]." *Raspardo v. Carlone*, 770 F.3d 97, 113 (2d Cir. 2014).

As to the first question, if the evidence construed in the light most favorable to the plaintiffs fails to establish as a matter of law that the defendant violated the plaintiff's constitutional rights, qualified immunity is warranted. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If, however, the evidence does demonstrate a violation of the plaintiff's constitutional rights, the second question is whether that constitutional right was "clearly established" at the time the official engaged in the conduct. *Saucier*, 533 U.S. at 201. Answering this second inquiry requires determining whether a reasonable official would understand that his conduct violated the constitutional right in question. *Id.* at 202. A court may consider these two questions in either order, and if it determines that one prong is not satisfied, it need not reach the other. *Raspardo*, 770 F.3d at 113.

### b.   Constitutional Injury

"A finding of personal involvement of [the individual] defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under Section 1983."[7] *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004). A plaintiff can "demonstrate[] such personal involvement" by establishing that the

---

[7] In their motion for summary judgment, the City Defendants do not dispute that Holmes, Foley, and Ringel's subordinates, *i.e.*, Marecki and Mercado, (could be found to have) committed a constitutional violation. (*See* City Defs. Memo. at 9-11.)

supervisor "was grossly negligent in supervising subordinates who committed the wrongful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001); *accord Chamberlain v. City of White Plains*, 960 F.3d 100, 114 (2d Cir. 2020) ("Section 1983 imposes liability only on supervising officials for grossly negligent supervision of subordinates who committed a [constitutional] violation."). The Second Circuit defines gross negligence as "conduct that demonstrates a heedless indifference to consequences to another," meaning "the kind of conduct . . . where [the] defendant has reason to know of facts creating a high degree of risk" of constitutional injury to another "and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Id.* The grossly negligent supervision standard "is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Rasparado*, 770 F.3d at 117. "A supervisor is not grossly negligent, however, where the plaintiff fails to demonstrate that the supervisor knew or should have known of a problematic pattern of employee actions or where the supervisor took adequate remedial steps immediately upon learning of the challenged conduct." *Id.*

i.      Inspector Holmes

The court first considers the evidence that has been adduced to support a finding that Inspector Holmes acted with gross negligence in supervising subordinates who violated Campo's right to equal protection under the Fourteenth Amendment by sexually harassing and assaulting her. (*See* Campo City Opp. at 14.) Holmes testified that, as Commanding Officer, she was responsible for "supervising everyone" and that "supervisors . . . are required to take action" in responding to complaints of sexual harassment. (Holmes Dep. at 7:3-4, 69:12-17.) In April 2018, Campo sent an email to Holmes reporting a "very hostile work

environment" and alleging, with a timeline of events and in con-
siderable detail, that she had been sexually harassed by Marecki
and sexually assaulted by Mercado, that Marecki continued to
sexually taunt her in the precinct, and that Mercado continued
to be "abrasive" and "hostil[e]" to her. (Campo Ex. 8. (Dkt. 52-
15.).) The next day, Holmes referred Campo's complaint to the
EEO and IAB, expressing disbelief regarding Campo's allegations
and suggesting that she needed psychological help. (*See* Campo
Ex. 11; Campo Ex. 22.) Campo testified that when she subse-
quently reported that her memo book had been stolen, Holmes
told her, "Enough with this shit. Get out of my office." (Campo
Dep. at 124:13-14.) Holmes testified that, at the time, she did
nothing to separate Campo from Marecki and Mercado and in-
deed was not even aware about whom she had complained.
(Holmes Dep. at 63:13-64:3, 68:20-69:22, 71:6-9.) Campo's sub-
sequent complaints to IAB indicate that, for months, Marecki and
Mercado continued to call her derogatory, sexually charged
names every time they crossed paths at work. (Campo Aff. ¶¶ 75-
76, 92.) Not until a new commanding officer replaced Holmes in
December 2019 was Campo given assignments that would sepa-
rate her from Mercado in order to protect her from his ongoing
harassment; by that time Marecki had been transferred out of the
precinct. (City 56.1 ¶¶ 39, 55, Campo Aff. ¶¶ 109-10.)

A reasonable jury could find that Holmes's total failure to super-
vise Marecki and Mercado, after being notified of their alleged
ongoing harassment of Plaintiff, constituted gross negligence.
The City Defendants' only argument in response is that Holmes
made a report to the EEO and IAB about Campo's initial com-
plaints. (City Defs. Mot. at 9.) The court finds Holmes's response,
which consisted only of this report, insufficient to warrant sum-
mary judgment in the City Defendants' favor.

It is true that "[a] supervisor is not grossly negligent . . . where
the supervisor took *adequate* remedial steps immediately upon

learning of the challenged conduct." *Raspardo*, 770 F.3d at 117 (emphasis added). But, in order to be adequate, such responses must be meaningful. *See Talib v. Officer Garcia*, No. 98-cv-3318, 2000 WL 968772, at *7 (S.D.N.Y. July 12, 2000) (officials must make a "meaningful investigation into charges that [subordinates] had used excessive force"); *Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 79 (E.D.N.Y. 2015) ("meaningful[ ] investigation" required after notice). The relevant question is whether "essentially no action was taken" after the supervisors were put on notice. *Ramsay-Nobles v. Keyser*, No. 16-cv-5778 (CM), 2019 WL 4383187, at *19 (S.D.N.Y. Aug. 21, 2019). Thus, "opening real investigations and taking disciplinary action will typically shield a supervisor from liability, whereas merely going through the motions or conducting a superficial investigation will not." *Id.* *Compare Raspardo*, 770 F.3d at 124 (qualified immunity shielded a supervisor who, in response to allegations that his subordinate was harassing female officers: conducted a thorough investigation; disciplined the officer through verbal counseling; ordered the officer not to pick up female officers in his patrol vehicle; gave the officer another verbal warning when he continued to pick up female officers; and, eventually, suspended the officer for two days and ordered him to surrender two days' holiday time), *with Fiacco* , 783 F.2d at 329-31 (holding that police chief was deliberately indifferent to his officers' unlawful use of force where the chief had received five serious complaints of police brutality and had responded by personally interviewing the officers but not taking formal or written statements, opening any investigations, or making any notation in the officers' files).

The evidence described above suggests that Holmes expressed scorn and disbelief when reporting Campo's complaint to the EEO and IAB; never spoke to Marecki or Mercado about Campo's allegations; did not give Campo assignments that would separate her from Marecki and Mercado; and actively discouraged Campo from reporting the alleged ongoing harassment and retaliation.

In light of this evidence, as to the injury prong of the qualified immunity analysis, the court concludes that a reasonable jury could find Holmes's response to Campo's complaint was grossly negligent.

### ii.    Sergeant Foley

The court next considers whether Plaintiff has adduced evidence sufficient to support her claim that Sergeant Foley acted with gross negligence in supervising Marecki. Plaintiff testified that she had a "[v]ery nice" professional relationship with Sergeant Foley. (Campo Dep. at 51:6-9.) The evidence she has adduced in support of her claim against him consists of her testimony that, starting sometime in 2013 or 2014, she made verbal complaints to him that Marecki "would be getting drunk and text me all sort of crazy things in the middle of the night," and that Foley dismissed her complaints. (*Id.* at 54:5-11; Campo Aff. ¶ 7.) Plaintiff argues that, because of her complaints, Foley had a "duty" to "remedy the situation," which he grossly neglected. (Campo Opp. at 13.) Plaintiff also testified, however, that she herself did not report Marecki's texts to the IAB at the time because she "didn't want to get [Marecki] in trouble." (Campo Dep. at 54:21-23.) Indeed, she and Marecki were then continuing their friendship, which persisted until sometime in 2016 or 2017. (Marecki 56.1 ¶¶ 5-10, 21-27.) Thus, her claim against Sergeant Foley relies mostly on the shaky premise that he had a duty to discipline Marecki before even she thought it appropriate. Moreover, as the City Defendants note, Campo's complaints to Foley, according to her testimony, did not specifically describe the harassing nature of the "crazy things" Marecki had been texting her. (*See* City Defs. Memo. at 9.)

The only further evidence in support of Plaintiff's claim against Foley consists of Campo's affidavit, submitted in response to the City Defendants' summary judgment motion:

> I was explicit with Foley the texts were sexual in
> nature. Foley was dismissive . . . . I complained to
> Foley often. As I recall, if I received a sexual text at
> night, the next day, if I saw Foley, I would tell him
> about it. Foley was my direct supervisor when the
> inappropriate texts started and remained my di-
> rect supervisor through approximately 2017. After
> he was no longer my direct supervisor, he became
> [an] Integrity Control Officer and in that capacity,
> on multiple occasions when I would see him, I
> would continue to tell him that Marecki's conduct
> was continuing. My complaints to Foley were a
> regular occurrence and continued through 2018.

(Campo Aff. ¶ 7.) In her memo book from this time period, she took note of several complaints she made to Ringel but apparently recorded no complaints to Foley. (*See generally* Campo Ex. 2.) A jury may ultimately choose to disbelieve Campo's affidavit, but the affidavit suffices to raise a genuine issue of fact as to whether Foley was grossly negligent by failing to respond to Campo's ongoing complaints.[8]

### iii.     Sergeant Ringel

Finally, the court considers whether Plaintiff adduced evidence sufficient to support a finding that Sergeant Ringel acted with gross negligence in failing to supervise subordinates. Plaintiff's memo book indicates that, in 2016 and 2017, she complained to Sergeant Ringel about Marecki's text messages and harassing

---

[8] The City argues in its reply brief that Campo's affidavit contradicts her earlier deposition testimony, creating new factual disputes during briefing. (City Defs. Reply (Dkt. 48) at 1-3.) Although the affidavit provides addi-tional details that supplement Campo's deposition, the court does not agree it "contradicts" the deposition. Moreover, the court is unable to grant the City Defendants' motion for summary judgment on the claims against Foley on statute of limitations grounds, because Campo's affidavit suffices to create a triable issue of fact as to the dates of her ongoing complaints.

conduct, expressing fear, and Ringel responded by laughing and likening Marecki's conduct to the movie Silence of the Lambs. (Campo Aff. ¶ 13; Campo Ex. 2 at 96, 98, 100, 102.) Plaintiff also adduced evidence that Ringel mocked her situation in front of other officers, including by making a joke about Marecki "hiding in [Campo's] backyard in [the] trees." (Campo Ex. 2 at 8; Ciotti Aff. at ¶ 8-9.) Inspector Holmes testified that, as Campo's supervisor, Ringel was required to take action but did not do so. (Holmes Dep. at 69:12-17.) Defendants do not appear to dispute that a reasonable jury could find that Ringel acted with gross negligence.

Instead, the City Defendants respond only that Ringel was not "the cause of any constitutional injury" because "plaintiff, and plaintiff alone, controlled her personal off-duty communications with Marecki and when she wanted to stop receiving messages from him, all she had to do was simply 'block' him, which she successfully did twice." (*See* City Defs. Memo. at 9-10.) Their logic relies on two dubious premises: that, as a matter of fact, Campo could have easily prevented her harassment by blocking Marecki, which she "successfully did twice"; and that, as a matter of law, supervisors cannot be held liable for harassment that victim-subordinates could have easily prevented. The court flatly rejects the first premise. Plaintiff adduced substantial evidence that Marecki's harassment only intensified after she blocked him. (Campo Aff. ¶¶ 14, 96, 121, 123.) As for the second premise, the court doubts that supervisory liability doctrine includes this victim-blaming exception. It is well-established that the "causal link" for supervisory liability may be satisfied by a supervisor's gross negligence or deliberate indifference to a high risk of a subordinate violating another's constitutional rights – in this instance, Marecki sexually harassing Campo in violation of her equal protection rights. *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). In any event, the evidence adduced permits a reasonable

41

jury to conclude that Ringel's gross negligence was a cause of Marecki's violations of Campo's rights.

### c.   *Clearly Established Right*

The court must still consider whether the right in question here was "clearly established" at the time of the violation. *Tolan*, 572 U.S. at 655-56. To determine whether a right is clearly established, the court considers "the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable [official] in light of preexisting law." *Chamberlain*, 960 F.3d at 110. The plaintiffs are not required to identify clearly established law by identifying a case "directly on point." *Id.*

In the supervisory liability context, supervisors are protected by qualified immunity only to the extent that "reasonable officials could disagree about whether the supervisor's action was grossly negligent in light of clearly established law." *Raspardo*, 770 F.3d at 125. "Case law clearly establishes that a supervisor may be liable for failing to . . . inquire about his subordinates or into their actions," if the supervisor was "on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior." *Poe*, 282 F.3d at 141; *see, e.g.*, *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 255 (2d Cir. 2001) (holding that, where complaint alleged defendant-supervisors were aware teacher assaulted students on four occasions prior to his assault of the plaintiff, "a jury could find the [s]upervisors . . . were . . . grossly negligent in supervising" the teacher); *Venn v. City of New York*, 72 F.3d 1040, 1050-51 (2d Cir. 1995) (supervisors were not entitled to qualified immunity after they failed to monitor an officer who "had been identified by the police department as a 'violent-prone' individual" who had a confrontational "personality disorder"); *Meriwether v. Coughlin*, 879 F.2d 1037, 1047-48 (2d Cir. 1989) (affirming finding

of supervisory liability when evidence showed that supervisors knew or should have known that plaintiff-inmates' reputations as alleged planners of a violent insurrection would expose them to extreme hostility from the guards, yet took no precautions for the inmates' safety); *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983) (holding that a prison commissioner and superintendent could be held liable for their gross negligence and deliberate indifference to the constitutional rights of inmates, as indicated by their having actual or constructive notice that unconstitutional practices were taking place, and their failure to act on the basis of this information); *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (concluding that a prisoner stated a § 1983 claim against the prison superintendent asserting a violation of his rights at a prison disciplinary hearing because the evidence could show either that the superintendent was directly responsible for the conduct or that he allowed an unconstitutional policy or custom to continue despite the frequency of violations during hearings); *Wright v. McMann*, 460 F.2d 126, 134-35 (2d Cir. 1972) (rejecting immunity defense for prison warden who had knowledge, both through actual notice and by virtue of his position, of inhumane treatment in the prison's "strip cells"), *cert. denied*, 409 U.S. 885 (1972).

Case law thus establishes a right to be free from constitutional injury resulting from inadequate supervision of a subordinate about whom a supervisor had received complaints. And the right at issue in this case might be more narrowly identified as the right to be free from *sexual harassment* by subordinates about which a supervisor had received complaints. That more narrowly defined right is also clearly established. *See Wise*, 928 F. Supp. at 370 ("It is well-established in this Circuit [] that a supervisor who is grossly negligent in permitting his subordinates to engage in gender discrimination can be held liable under § 1983."); *Raspardo*, 770 F.3d at 119 ("[The] right to be free from severe or pervasive sexual harassment [is] clearly established."); *Carrillo v. Ward*,

770 F. Supp. 815, 822 (S.D.N.Y. 1991) (denying summary judgment where jury could find that supervisor "had actual or constructive knowledge of gender-discriminatory policies and that he permitted such conduct to continue, or was grossly negligent in his management of subordinates who promoted such conduct"); *Atwood v. Town of Ellington*, 468 F. Supp. 2d 340, 356 (D. Conn. 2007) (finding that "reasonable jurors could conclude defendant[-supervisor] was grossly negligent in not ensuring that [subordinate officer] received sexual harassment training . . . or training on how to handle intoxicated females").

Plaintiff adduced evidence sufficient to support a finding that she complained to Foley, Ringel, and Holmes, putting them on notice to the alleged ongoing sexual harassment by their subordinates. Plaintiff also has adduced evidence sufficient to support a finding that all three supervisors exhibited gross negligence in failing to discipline their subordinates or separate her from them, and that this failure caused her injuries. These rights are clearly established.

> ### d.    Conclusion

Accordingly, the court DENIES Defendants' motion for summary judgment granting Holmes, Foley, and Ringel qualified immunity, and the court also DENIES Defendants' motion for summary judgment on the merits of Plaintiff's supervisory liability claims against Holmes, Foley, and Ringel.

> ## 2.    NYSHRL/NYCHRL "Aiding and Abetting" Claims

Defendant Marecki next moves for summary judgment on Plaintiff's aiding and abetting claims against him, arguing that Plaintiff failed to establish threshold NYSHRL and NYCHRL claims and that his own conduct cannot be construed as "aiding and abetting." Defendants Holmes, Ringel, Foley, and Mercado move for summary judgment on the basis that "neither Holmes, Foley or

Ringel personally participated in the two alleged incidents of sexual harassment alleg[edly] involving Marecki and Mercado" and that Mercado "cannot aid and abet his own allegedly wrongful conduct."[9] Plaintiff opposes these motions on the basis that the City committed the underlying violations; because Marecki and Mercado "actually participate[d]" in the conduct giving rise to these violations; and because Campo's supervisors engaged in "calculated inaction . . . with respect to [her] complaints." (Campo Marecki Opp. at 1-2; Campo City Opp. at 25.)

In addition to direct liability for employers, the NYSHRL and NY-CHRL each provide for individual liability for aiding and abetting discrimination or retaliation. *See* N.Y. Exec. Law § 296(6) (providing that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article [including discrimination and retaliation], or to attempt to do so"); NYCHRL § 8-107(1)(6) (same). "[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL [and NY-CHRL] if he actually participates in the conduct giving rise to a discrimination claim." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021). But "before an individual may be considered an aider and abettor," liability "must first be established as

---

[9] The City Defendants also moved for summary judgment on Plaintiff's "aiding and abetting" claims against the City. (City Defs. Mot. at 17.) Plaintiff opposed. (Campo City Opp. at 24-25.) These motions are *non sequiturs*, because the complaint asserted "aiding and abetting" claims only against "[t]he Individual Defendants" – *i.e.*, Marecki, Mercado, Holmes, Foley, and Ringel – and not the City. (Compl. at ¶¶ 64-66.) In any event, an "aiding and abetting" claim against the City would fail as a matter of law. True, the NYSHRL and NYCHRL expressly define "person" to include "corporations," NYSHRL § 292(1); NYCHRL § 8-102a, and thus a municipal corporation could be held liable for "aiding and abetting" another corporation's discriminatory conduct. *See, e.g.*, *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.*, 968 F.2d 286, 294 (2d Cir.1992). But it does not follow that the City could be held liable for "aiding and abetting" its own alleged discriminatory and retaliatory conduct.

to the employer." *Torres v. New York Methodist Hospital*, No. 15-cv-1264 (PKC) (PK), 2016 WL 3561705 at *12 (E.D.N.Y. Jan. 7, 2016).

>    a.    *Threshold NYSHRL and NYCHRL Claims Against the City*

The court first considers whether a reasonable jury could conclude that City committed underlying NYSHRL and NYCHRL violations, such that the individual defendants could be held liable for "aiding and abetting" those violations. The court has already held that a reasonable jury could find the City liable for retaliation under the NYSHRL and NYCHRL. *See supra* Part III.C. Thus, at this point the court must only determine whether the City may be held liable for a hostile work environment. It is important to reiterate here that *the City* has not moved for summary judgment on Plaintiff's hostile work environment claims. (*See* Complaint ¶ 64; Campo Marecki Opp. at 2; *see generally* City Defs. Mot.) The only party who insists that a reasonable jury could not find that Plaintiff suffered a hostile work environment is Defendant Officer Paul Marecki. (*See* Marecki Mot. at 9-15.)

Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard. *Summa v. Hofstra University*, 708 F.3d 115, 123-24 (2d Cir. 2013). "In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Id.* at 124. A plaintiff may satisfy the first prong by showing either that "a single incident was extraordinarily severe" or that "a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach*, 202 F.3d 560, 570 (2d Cir. 2000). As for the second prong, "an employer will

be liable in negligence for a racial or sexually hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action." *Richardson*, 180 F.3d at 446.

The NYCHRL covers a broader scope of discriminatory conduct than its federal and state counterparts. *Mihalik*, 715 F.3d at 109. To withstand summary judgment on a NYCHRL hostile work environment claim, a plaintiff need not show that the harassment was "severe and pervasive." *Id.* at 113. Nevertheless, a defendant will not be liable if the plaintiff "fails to prove the conduct is caused at least in part by discriminatory [] motives," or if "the defendant proves the conduct was nothing more than petty slights or trivial inconveniences." *Id.*

Marecki focuses exclusively on his own conduct in erroneously concluding that "[s]ince Officer Marecki's alleged harassment was not severe and pervasive as defined by the law, and since his actions did not interfere with Plaintiff's job performance, Plaintiffs [sic] sexual harassment and hostile work environment claim should be dismissed." (Marecki Mot. at 9.) This tunnel vision is misguided. In considering the City's threshold liability for a "hostile work environment," the court considers the "totality of the circumstances" of Plaintiff's workplace environment, not just Marecki's conduct. *See Rivera*, 743 F.3d at 20-21. Plaintiff adduced evidence not only that Marecki, over the span of several years, sent her many harassing, sexually charged text messages, but also that, for over a year, both Marecki and Mercado frequently directed sexually charged slurs to her at work.[10] (*See generally* Text Messages.) Plaintiff also testified that she was sexually assaulted by Mercado. (Campo Aff. ¶ 30.) In aggregate, this conduct was "severe and pervasive." *See Tomka v. Seiler Corp.*, 66

---

[10] *See supra* note 2.

F.3d 1295, 1305, n.5 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742 (1998) (holding that "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability" and that a trier of fact should consider verbal sexual harassment "together with the assault[]" on the issue of hostile working environment).

The court next considers whether there is a basis for imputing Marecki and Mercado's sexual harassment, and Mercado's sexual assault, to the City. "Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Fairbrother v. Morrison*, 412 F3d 39, 49 (2d Cir. 2005). Campo testified that she complained to Ringel on multiple occasions about Marecki's harassment. (Campo Aff. ¶ 13.) She also sent Holmes a written complaint describing, in detail, her sexual assault and the harassment she continued to experience. (*Id.* ¶ 48.) The court has already found that a reasonable jury could conclude that Foley, Ringel, and Holmes failed to take appropriate remedial action in response to these complaints. *See supra* Part III.B.1.b.i, iii. Moreover, Plaintiff adduced evidence suggesting that, in handling her complaint, the EEO and IAB's investigation was lax and unnecessarily slow. (*See* Campo Counterstatement to City 56.1 ¶ 38; *see generally* Campo Aff. ¶¶ 51-115.)

A reasonable jury could find that, by failing to question or discipline Marecki until a year after Campo filed her April 2018 complaint, the City allowed Marecki's harassment to continue. Likewise, a reasonable jury could find that, by failing to question Mercado until over a year into the investigation or ultimately to

discipline him in any way, the City allowed his harassment to continue. At bottom, a reasonable jury could find that the City knew or should have known about the hostile work environment but failed to take appropriate remedial action. *See Fairbrother*, 412 F.3d at 52 (holding that reasonable jury could find that employer "knew or should have known about the co-worker harassment faced by" the plaintiff where she had complained on multiple occasions to supervisors and a Personnel Director about the "sexually hostile work environment she was facing," providing "specific examples of what was going on," and that employer "failed to take appropriate remedial action" as "none of these complaints spurred meaningful action").

### b. Individual "Aiding and Abetting" Liability

After rejecting Officer Marecki's initial argument and concluding that a reasonable jury could find that City did commit underlying NYSHRL and NYCHRL retaliation and hostile work environment violations, the court must now consider whether a reasonable jury could find each of the individual defendants liable for "aiding and abetting" the City's underlying violations. "An individual need not have supervisory or hiring/firing power to be subject to suit under these provisions, so long as he actually participated in the conduct giving rise to the discrimination claim." *Torres*, 2016 WL 3561705 at *12; *see Feingold*, 366 F.3d at 158 (individual liability may be imposed on a coworker who "actually participates in the conduct giving rise to a discrimination claim . . . even though that co-worker lacked the authority to either hire or fire the plaintiff").

### i. Officer Marecki

Defendant Marecki submits a bevy of reasons why he cannot be held liable for "aiding and abetting" the City's NYSHRL and NYCHRL violations. The court has already rejected one reason, but four theories remain. First, Marecki argues that "[s]ince an individual cannot aid and abet his own alleged discriminatory

conduct, it is respectfully submitted that Officer Marecki's own behavior, to wit his alleged disparaging comments and sexually explicit text messages, cannot be the sole basis for Plaintiff's aider and abettor claims." (Marecki Mot. at 4-5.) Second, he argues that "Plaintiff cannot show that Officer Marecki is subject to liability as an aider and abettor with respect to conduct by Officer Mercado." (*Id.* at 5.) Third, insofar as Plaintiff's claims are premised on sexually harassing text messages, Marecki argues that these claims "should be dismissed since they did not occur at the workplace." (*Id.* at 5-8.) Finally, Marecki asserts that "Plaintiff is time barred from alleging sexual harassment, hostile work environment, and retaliation pursuant to the NYSHRL, and NYCHRL for conduct that occurred prior to January 17th, 2016." (*Id.* at 8.)

Marecki's first argument is based on a false premise. Plaintiff does not accuse him of aiding and abetting "his own alleged discriminatory conduct." Rather, she contends that he aided and abetted Plaintiff's *employer* – the City – in retaliating against her and in its creation of a hostile work environment by actually participating in the conduct giving rise to those claims. Holding liable an individual co-worker who "actually participates" in the *employer's* creation of a hostile work environment, or retaliation, is precisely the type of conduct that the aiding and abetting provisions of the NYSHRL and NYCHRL provide a remedy for. As the Second Circuit has held, "an individual defendant may be held liable under the aiding and abetting provision of the NYSHRL [and NYCHRL] if he actually participates in the conduct giving rise to a discrimination claim." *Francis*, 992 F.3d at 81. "This extends to personal liability 'for aiding and abetting allegedly unlawful discrimination by [an] employer *even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability,' so long as the employee's conduct has also been found to be discriminatory under the NYSHRL.*" *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 75 (S.D.N.Y. 2020) (emphasis in original). Plaintiff has adduced sufficient evidence that Marecki

actually participated in the conduct giving rise to her hostile work environment and retaliation claims. *See supra* Parts III.A.1.b, III.B.2.a.

Marecki's second argument, that he did not aid and abet Mercado's alleged conduct, is apparently uncontroverted. Plaintiff has not sought to hold Marecki liable for Mercado's sexual assault or workplace misconduct; instead, she seeks to hold Marecki liable only for his own sexual harassment, insofar as it contributed to the City's hostile work environment and retaliation. (*See* Campo Marecki Opp. at 10.) A lack of conspiracy between Marecki and Mercado is not a reason to dismiss Plaintiff's aiding and abetting claim. To reiterate: Plaintiff accuses Marecki of aiding and abetting not himself, nor Officer Mercado, but rather *the City* in its creation of a hostile work environment and in its retaliation.

Marecki next argues that "Plaintiff's claims for hostile work environment and sexual harassment premised on text messages, should be dismissed since they did not occur at the workplace." (Marecki Mot. at 5.) But, as Plaintiff notes in response, the majority of Marecki's alleged harassment indeed occurred at work: the in-person sexual and romantic advances, the sexual slurs and accusations, and the disparaging comments to other officers behind Campo's back. In any event, sexual harassment outside the workplace can, under certain circumstances, contribute to a hostile work environment. *See, e.g.*, *Tomka*, 66 F.3d at 1301-02, 1305-06. Thus, this basis for summary judgment is a nonstarter.

Finally, the court considers Marecki's argument that conduct that occurred prior to January 17, 2016, may not be considered in assessing Marecki's liability for aiding and abetting the City's hostile work environment. True, "claims under the NYSHRL and the NYCHRL are time-barred unless filed within three years of the alleged discriminatory acts." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007). But Plaintiff argues that her

claims against Marecki are "timely pursuant to the continuing violation rule." (Campo Marecki Opp. at 11-13.) The continuing violation doctrine "applies to claims composed of a series of separate acts that collectively constitute one unlawful practice. "The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (citing *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 114-15 (2002)).

An employer's creation of a hostile work environment is a quintessential "continuing violation." *See Morgan*, 536 U.S. at 114-15. The Supreme Court has explained:

> Hostile work environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

*Morgan*, 536 U.S. at 115. Accordingly, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105; *see also id.* at 118 ("Given . . . that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim."); *see McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75-76 (2d Cir. 2010). The court thus

rejects Marecki's argument that Plaintiff's hostile work environment claim cannot be premised on conduct that occurred before January 17, 2016.

The court must still decide whether Plaintiff's "aiding and abetting" claim against Marecki, which derives from (but is distinct from) her hostile work environment claim against the City, can be premised on conduct that occurred more than three years prior to the filing of this suit.[11] Plaintiff's claim against Marecki, like her threshold hostile work environment claim, is not premised on a "discrete act," but rather, on a "series of acts that collectively constitute one unlawful practice," persisting within the applicable statute of limitations period. *Morgan*, 536 U.S. at 117. Plaintiff has adduced evidence that Marecki frequently sent her sexually harassing text messages from 2014 through 2017. These messages were of a similar character: explicit, propositioning, exhibiting intoxication, at times aggressive, at times hostile, at times infatuated and obsessive. (*See generally id.*) After she blocked him in 2017, this sexual harassment allegedly intensified to the point that he frequently directed sexual slurs at her in her workplace. Though each text message or slur was a "separate act," a reasonable jury could nonetheless find that, collectively, these acts constitute one unlawful practice of "aiding and abetting" the creation of a hostile work environment. *See Draeger v. Bronx-Lebanon Hosp. Ctr.*, No. 98-CV-3688 HB, 1999 WL 562103 (S.D.N.Y. Aug. 2, 1999) (finding a "continuing violation" where "[t]he alleged acts by [the defendant] all involved the same type

---

[11] Unlike hostile work environment claims, "aiding and abetting" claims can be premised on "discrete acts." For example: suppose a male employee is accused of "aiding and abetting" a hostile work environment by allegedly sexually demeaning his female co-worker at a staff meeting in 2012. Suppose the male employee was fired in 2013, but the employer allegedly perpetuated a sexually hostile work environment that persisted through 2019. The long-since-fired employee probably should not be liable to suit in 2022 for allegedly "aiding and abetting" the employer a decade ago.

of discrimination, *i.e.* a campaign of inappropriate comments and verbal sexual harassment, as well as unwanted groping and grabbing"). Thus, the entire scope of Marecki's text messages may be considered in assessing his "aiding and abetting" liability.

Accordingly, Marecki's motion for summary judgment on Plaintiff's "aiding and abetting" claims against him is DENIED.

### ii.     Officer Mercado

The City Defendants argue that "plaintiff's claim against Mercado fails, for the simple reason that a person cannot aid and abet his own allegedly wrongful conduct." (City Defs. Mot. at 18.) But Mercado is not accused of aiding and abetting himself; like Marecki, he is accused of aiding and abetting the City in its hostile work environment and retaliation. Plaintiff has adduced sufficient evidence that Mercado actually participated in the conduct giving rise to her hostile work environment and retaliation claims. *See supra* Parts III.A.1.b, III.B.2.a. Accordingly, Defendants' motion for summary judgment on Plaintiff's "aiding and abetting" claims against Officer Mercado is DENIED.

### iii.     Inspector Holmes

For a supervisor to be held liable for "aiding and abetting" discrimination or retaliation, the Second Circuit has said that a plaintiff must show that the supervisor "actually participated" in the conduct giving rise to the discrimination or retaliation claim. *See Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011). The crux of Plaintiff's retaliation claim against the City is her evidence that Inspector Holmes failed to separate her from Officers Marecki and Mercado despite their ongoing harassment and despite her complaints. *See supra* Part III.A.1.b. Holmes's conduct constitutes "actual participation." Campo testified that, after initially complaining to her in April 2018, Holmes, with whom she had previously been friendly, "gave me the cold shoulder" and "never looked at or spoke to me

again," with one exception: after Campo complained about the locker incident to Holmes, Holmes responded with "words to the effect of, 'Enough with this shit, your locker wasn't broken into, retaliation can only come from those named in the EEO complaint, get out of my office.'" (Campo Aff. ¶ 50; Campo Dep. 120, 122-23, 124, 131; Campo Ex. 2.) Moreover, responding to Holmes's complaint to the EEO and IAB, Holmes told investigators that Campo required "psych services." (Campo Ex. 11; Campo Aff. ¶ 51.) A reasonable jury could find on these facts that Inspector Holmes "actually participated" in the conduct giving rise to Plaintiff's retaliation claim.

The court next considers whether a reasonable jury could find that Inspector Holmes "aided and abetted" the City in the creation of a hostile work environment on the basis of sex. There is no evidence in the record suggesting that Inspector Holmes discriminated against Campo on the basis of her sex or actually participated in any gender-motivated or sexually motivated conduct. There is, however, evidence sufficient to support a finding that Holmes caused the creation of a hostile work environment through her grossly negligent supervision of subordinates who sexually harassed Campo. *See supra* Part III.B.1.b.i. The Second Circuit has not explicitly stated that grossly negligent supervision constitutes "actual participation" under the NYSHRL and NYCHRL. However, in the context of § 1983 supervisory liability claims, which require the supervisor's "personal involvement" in an alleged constitutional deprivation, it is well-settled in this Circuit that a plaintiff can "demonstrate[] such personal involvement" by establishing that the supervisor "was grossly negligent in supervising subordinates who committed the wrongful acts." *Provost*, 262 F.3d at 154. From this, the court concludes that a plaintiff can demonstrate "actual participation" under the NYSHRL and NYCHRL as well by establishing grossly negligent supervision, since "actual participation" and "personal involvement" are sufficiently analogous legal concepts. Indeed, in

*Feingold v. New York*, the Second Circuit drew a parallel between NYSHRL and NYCHRL "aiding and abetting" claims and § 1983 supervisory liability claims, holding that satisfaction of the former implies satisfaction of the latter. *See* 366 F.3d at 159 ("We have earlier found that Feingold has presented sufficient evidence to permit the conclusion that all of the named individual defendants were personally involved in behavior unlawful under the NYSHRL. It follows that he has also presented sufficient evidence . . . to permit the conclusion that they were personally involved in behavior that violates Section 1983."). Because Inspector Holmes was "personally involved" in the creation of a hostile work environment under § 1983 due to her grossly negligent supervision, it follows that she "actually participated" in that conduct under the NYSHRL and NYCHRL as well. The City Defendants' motion for summary judgment on the claims against Holmes is therefore DENIED.

### iv.   Sergeant Foley

Plaintiff's only allegation against Sergeant Foley is that he was "dismissive" when she complained to him regarding Marecki's harassment. In general, however, she had a "[v]ery nice" professional relationship with Sergeant Foley, according to her own testimony. (Campo Dep. at 51.6-9.) The evidence thus does not support a finding that Sergeant Foley directly participated in the City's alleged hostile work environment or retaliation. But, as the court has explained, grossly negligent supervision constitutes "actual participation," and a reasonable jury could find Sergeant Foley liable for grossly negligent supervision of Officer Marecki. *See supra* Part III.B.1.b.ii. Therefore, a reasonable jury could find that Sergeant Foley "actually participated" in the conduct giving rise to Plaintiff's retaliation and hostile work environment claims. The City Defendants' motion for summary judgment on the claim against Foley is therefore DENIED.

v.       Sergeant Ringel

As to Sergeant Ringel, Plaintiff adduced evidence that, after she complained to him about Marecki's harassment, expressing her fear, Ringel responded by laughing and likening Marecki's conduct to the movie Silence of the Lambs. (Campo Aff. ¶ 13; Campo Ex. 2 at 96, 98, 100, 102.) She also adduced evidence that Ringel mocked her situation in front of other officers and made a joke about Marecki "hiding in [Campo's] backyard in [the] trees." (Campo Ex. 2 at 8; Ciotti Aff. at ¶ 8-9.) From this evidence, a reasonable jury could find that Ringel directly participated in the City's creation of a hostile work environment. Moreover, insofar as these jokes "could well have dissuaded a reasonable employee" in Campo's position "from complaining of unlawful discrimination," *Davis-Garett*, 921 F.3d at 43-44, a reasonable jury could find that Ringel directly participated in the City's retaliation under the NYSHRL and NYCHRL. Moreover, Ringel may be held liable for "aiding and abetting" because grossly negligent supervision constitutes "actual participation," and because a reasonable jury could find that Ringel's supervision of Officer Marecki was grossly negligent. The City Defendants' motion for summary judgment on the claim against Ringel is therefore DENIED.

c.       *Conclusion*

In summary, all individual defendants' motions for summary judgment on the aiding and abetting claims under the NYSHRL and NYCHRL are DENIED.

## IV.  CONCLUSION

For the foregoing reasons, Defendant Officer Paul Marecki's motion for summary judgment is DENIED, and the City Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part.

To summarize, except for the *Monell* claims, the claims that remain are: Plaintiff's retaliation and hostile work environment claims against the City under Title VII, § 1983, the NYSHRL, and the NYCHRL; Plaintiff's § 1983 supervisory liability claims against Sergeant Ringel, Sergeant Foley, and Inspector Holmes; and Plaintiff's "aiding and abetting" claims against Officer Marecki, Officer Mercado, Sergeant Ringel, Sergeant Foley, and Inspector Holmes under the NYSHRL and NYCHRL. The parties are directed to contact Magistrate Judge Sanket J. Bulsara to propose a pre-trial order.

SO ORDERED.


Dated:      Brooklyn, New York
            March 31, 2022

                                    s/Nicholas Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge